# In the United States Court of Federal Claims

No. 18-1602

Filed: September 6, 2023†

---

**ANDRES NIEVES,**

        *Petitioner,*

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES,**

        *Respondent.*

---

*Michael Adley Baseluos*, Baseluos Law Firm, PLLC, San Antonio, TX, for Petitioner.

*Ryan D. Pyles,* Senior Trial Attorney, *Gabrielle M. Fielding,* Assistant Director, *Heather L. Pearlman,* Deputy Director, *C. Salvatore D'Alessio,* Director, and *Brian M. Boynton,* Principal Deputy Assistant Attorney General, Torts Branch, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

      The National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10 *et seq*. (2012) ("Vaccine Act"), grants special masters broad discretion when evaluating the merits of vaccine claims. That discretion, though bounded, extends to the special master's individualized weighing of evidence; if rational, the special master's exercise of such discretion is conclusive.

      Andres Nieves ("Mr. Nieves"), petitioned for compensation under the Vaccine Act alleging that he suffered from Guillain-Barre syndrome ("GBS")[1] and neurologic complications

---

† This Order was originally filed under seal on August 21, 2023. (ECF No. 118). The Court provided parties the opportunity to review this opinion for any proprietary, confidential, or other protected information and submit proposed redactions no later than September 5, 2023. The parties failed to file a Joint Status Report requesting redactions. Thus, the sealed and public versions of this Order are identical, except for the publication date and this footnote.

[1] GBS is "a rare disorder in which your body's immune system attacks your nerves. Weakness and tingling in your hands and feet are usually the first symptoms. These sensations can quickly

after administration of the influenza ("flu") vaccine. (Pet., ECF No. 1). Specifically, Mr. Nieves alleged he experienced numbness and "ascending paresthesia[2]" of the lower extremities, "disabling fatigue," and had to use a walker and cane to maneuver. (*Id*. at 2–3). The Chief Special Master determined the record did not support a Table GBS-flu claim but might support a causation-in-fact claim due to Mr. Nieves's Chronic Inflammatory Demyelinating Polyneuropathy ("CIDP")[3] diagnosis. (Jan. 11, 2021 Decision, ECF No. 42). The Chief Special Master reviewed Mr. Nieves's claim, concluding that the record and expert reports did not support causation, or that Mr. Nieves's "onset of neurologic symptoms [for CIDP] occurred in a medically acceptable timeframe" from the date of flu vaccination. *Nieves v. Sec'y of Health & Hum. Servs.*, No. 18-1602V, 2023 WL 3580148, at *1 (Fed. Cl. Spec. Mstr. May 22, 2023). Consequently, the Chief Special Master denied entitlement. (*Id.*).

Mr. Nieves seeks review, (ECF No. 106), arguing that the Chief Special Master's legal and factual conclusions and limiting instructions for an expert witness report should be set aside as arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. (Mem. Mot. for Rev. ("Pet'r's Mem.") at 13, 17, ECF No. 108).[4] As explained below, the Court denies Mr. Nieves's Motion for Review and affirms the Chief Special Master's rulings.

## I.   Background

The Chief Special Master provided a detailed factual recitation in the published decision. *Nieves*, 2023 WL 3580148, at *1–5. For purposes of this Opinion, the Court will only address facts relevant to Mr. Nieves's current Motion.

Before Mr. Nieves received the flu vaccine in 2015, he experienced a litany of maladies, several of which "echo some of his post-vaccination" symptoms. *Id.* at *2. In September 2013, Mr. Nieves reported pain radiating from "both shoulder[s] into the arms with a sensation of

---

spread, eventually paralyzing your whole body." *Guillain-Barre syndrome*, Mayo Clinic, (last reviewed June 14, 2022), https://www.mayoclinic.org/diseases-conditions/guillain-barre-syndrome/symptoms-causes/syc-20362793.

[2] Paresthesia is a prickling or tingling sensation. *Paresthesia*, Cleveland Clinic, (last reviewed Apr. 26, 2023), https://my.clevelandclinic.org/health/symptoms/24932-paresthesia.

[3] CIDP is a "neurological disorder that involves progressive weakness and reduced senses in the arms and legs. It is caused by damage to the fat-based protective covering on nerves called myelin sheath." *Chronic Inflammatory Demyelinating Polyneuropathy (CIDP)*, Nat'l Inst. of Neurological Disorders & Stroke, (last reviewed Mar. 3, 2023), https://www.ninds.nih.gov/health-information/disorders/chronic-inflammatory-demyelinating-polyneuropathy-cidp.

[4] The citations correspond with the Adobe-Acrobat Pro pagination, not the assigned page number on which the document appears.

heaviness and weakness[,]" diminished fine motor skills,[5] and "episodes where he gets very weak in the legs[.]" (Petitioner's Exhibit "Ex." 2 at 29–30, ECF No. 1-3). In January 2014, a neurologist noted that Mr. Nieves experienced "[p]rogressively worsening episodes of legs going numb and him falling." (*Id.* at 26). In December 2014, Mr. Nieves had cervical decompression surgery to address neck pain and weakness, numbness, and pain in both arms. (Ex. 4 at 12–17, ECF No. 1-5). In February 2015, Mr. Nieves's physician prescribed him fibromyalgia[6] medication and reported "he has muscle spasms." (Ex. 3 at 97–98, ECF No. 1-4).

On October 28, 2015, a licensed practical nurse administered Mr. Nieves's flu vaccine. (Ex. 1 at 1, ECF No. 1-2). On his immunization consent form, Mr. Nieves reported that he was not moderately or severely ill that day and never had GBS[7] nor an active un-stabilized neurological disorder. (*Id.*). Immediately following the shot, Mr. Nieves attested that he experienced flu-like symptoms but did not feel any paresthesia, weakness, or tingling. (Ex. 19 ("Nieves Aff.") at 2, ECF No. 41-2).[8]

On October 31, Mr. Nieves's flu-like symptoms receded but he attested to "feeling strange," noticing a change in walking, and losing sensation in his hands and feet. (*Id.*). On November 1 and 2, he attested to difficulty walking, feeling like his feet were "marshmallows[,]" fatigue, and loss of "sensation of grabbing and holding things." (*Id.*). On November 2, Mr. Nieves presented at the emergency room ("ER") complaining of fatigue, leg pain, and lower back pain for the last five days, dating the onset of symptoms to October 28. (Pet. Ex. 3 at 89–90). Mr. Nieves saw a neurologist on November 3 where he reported feeling "off balance" and that a police officer "thought he was intoxicated while walking[,]" (*Id.* at 84–85); however, the neurologist noted Mr. Nieves had a "normal gait" with normal strength and reflexes. (*Id.* at 85). The neurologist also recorded that Mr. Nieves "present[ed] with [one] week history of paresthesia in his distal extremities since he got his flu shot one week ago[,]" thereby dating onset of symptoms to on or around October 27 or 28. (Pet. Ex. 3 at 84). Mr. Nieves disputed this timeline clarifying that the flu shot, not neurologic symptoms occurred a week prior; but he failed to challenge the November 2 medical records that also dated his symptom onset to October 28. (Nieves Aff. at 3).

---

[5] Mr. Nieves reported difficulty buttoning shirts, tying shoes, and a change in his handwriting. (Ex. 2 at 29, ECF No. 1-3).

[6] Fibromyalgia is "a chronic [] disorder that causes pain and tenderness throughout the body, as well as fatigue and trouble sleeping. Scientists do not fully understand what causes it, but people with the disorder have a heightened sensitivity to pain." *Fibromyalgia*, Nat'l Inst. of Arthritis & Musculoskeletal & Skin Diseases, (last reviewed June 2021), https://www. https://www.niams.nih.gov/health-topics/fibromyalgia.

[7] GBS was described as "an illness with sudden muscle weakness." (*Id.*).

[8] The timeline of Mr. Nieves's reaction to the flu vaccination in the Nieves Affidavit shift from 2015 to 2016. (Nieves Aff. at 1–3). The Court adopts the Chief Special Master's understanding that the 2016 references are typographical error. *Nieves*, 2023 WL 3580148, at *3 n.3.

On November 4, Mr. Nieves again presented at the ER complaining of "increasing back pain and generalized weakness since flu shot." (Ex. 3 at 76). A physician noted that Mr. Nieves reported difficulty walking, but that he was "ambulating without assistance with no difficulty." (*Id.*). She also wrote that Mr. Nieves mostly complained of lower back pain worsening with movement, but that he "admit[ted] that he has been on chronic pain meds" with no pain relief. (*Id.*). Mr. Nieves returned to the ER on November 9, reporting worsening back pain that radiated up to his neck, shoulders, and arms, but no weakness, numbness, or tingling in his legs. (*Id.* at 67–69). A physician noted his slow gait and that his symptoms were "unlikely" to be a "neurological problem like GBS/cord compression." (*Id.*).

Mr. Nieves saw his primary care physician on November 10, who noted his "increasing weakness fatigue and generalized muscle pain after getting [flu] vaccine" but "denie[d] actual progressive weakness ascending or otherwise[.]" (Ex. 5 at 1, ECF No. 1-6). The physician referred Mr. Nieves to the ER; the Methodist Hospital in San Antonio, Texas admitted him for ten days. (*Id.*; Ex. 3 at 65; Ex. 9, ECF No. 1-12). At the hospital, a physician noted "[s]ince the flu shot" Mr. Nieves experienced "progressive tingling, numbness, [and] problems with frequent falls because of this" and expressed a concern for GBS. (Ex. 9 at 16). Mr. Nieves was discharged on November 20 though he still experienced "progressive lower extremity weakness" and leg pains. (*Id.* at 4). On January 8, 2016, Mr. Nieves reported worsening paresthesia, pain, and tingling in both arms and legs as well as poor balance so that he "require[d] a walker." (Ex. 3 at 45). His physician wrote that although he was diagnosed with GBS at the hospital, the "prolonged duration of symptoms" likely indicated CIDP. (*Id.* at 44–47).

Mr. Nieves petitioned for vaccine compensation on October 17, 2018, claiming the flu vaccine caused GBS, balance difficulties, paralysis of lower extremities, some paresthesia in upper extremities, and disabling fatigue so he was entitled to compensation under the Vaccine Act. (*See generally* Pet.). The Chief Special Master determined the record supported Mr. Nieves's CIDP diagnosis, not GBS, (*see generally* Jan. 11, 2021 Decision); he also limited the scope of Mr. Nieves's last two expert reports, citing the volume of existing expert testimony. (May 23, 2022 Order, ECF No. 81). Ultimately, the Chief Special Master determined that Mr. Nieves was not entitled to compensation under the Vaccine Act because he failed to establish causation. *Nieves*, 2023 WL 3580148, at *49–61. Mr. Nieves challenges the Chief Special Master's legal and factual conclusions regarding causation. (Pet'r's Mem. at 15–23). Mr. Nieves also argues the Chief Special Master's May 23, 2022 Order "severely restricted" his ability to respond to an expert report. (*Id.* at 23–24).

## II.   Analysis

Pursuant to the Vaccine Act, the Court of Federal Claims reviews a special master's decision when a party timely files a motion for review. *See* 42 U.S.C. § 300aa-12(e)(1)–(2) (2018). The Court must determine if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 42 U.S.C. § 300aa-12(e)(2)(B). The Court reviews factual findings under the arbitrary and capricious standard and all legal conclusions de novo. *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992) (adding abuse of discretion will "rarely come into play except where the special master excludes evidence"). To review mixed questions of law and fact, the Court must determine "whether answering it entails primarily legal or factual work." *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v.*

4

*Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018) (involving determination by bankruptcy court).

Notably, the Court does not "reweigh the factual evidence," or "assess whether the special master correctly evaluated the evidence." *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000) (quoting *Munn*, 970 F.2d at 871). The Court also does not "examine the probative value of the evidence or the credibility of the witnesses[]" so long as the special master "considered the relevant evidence of record, dr[ew] plausible inferences and articulated a rational basis for the decision[.]" *Id.*; *Hines on behalf of Sevier v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991) (holding "reversible error [is] extremely difficult to demonstrate"). As such, the Court's standard of review is "highly deferential." *Cucuras v. Sec'y of Dep't of Health and Hum. Servs.*, 26 Cl. Ct. 537, 541 (1992), *aff'd*, 993 F.2d 1525 (Fed. Cir. 1993).

To determine causation, the special master and the Court apply the three-prong test established in *Althen v. Secretary of Health and Human Services*. 418 F.3d 1274, 1278 (Fed. Cir. 2005). To establish causation, a petitioner must preponderantly show: "(1) a medical theory connecting the vaccination and injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury." *Id.* These determinations are largely factual and case specific. If a petitioner satisfies all three prongs, he is entitled to compensation unless the Secretary preponderantly shows "that the injury was in fact caused by factors unrelated to the vaccine." *Id.* (quoting *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 547 (Fed. Cir. 1994)).

Here, Mr. Nieves challenges the Special Master's decision on three main grounds. (Pet'r's Mem. at 16–24). First, Mr. Nieves challenges the Special Master's *Althen* prong two analysis. (*Id.* at 16–20). Specifically, Mr. Nieves argues, in violation of case law, the Chief Special Master (1) ignored physician notes that associated his peripheral neuropathy with the flu vaccine, (2) improperly required "direct evidence" of causation from physicians, and (3) incorrectly determined his comorbidities interfered with the sequence cause and effect. (*Id.*). Second, Mr. Nieves argues the Chief Special Master arbitrarily and capriciously relied on Mr. Nieves's affidavit rather than contemporaneous medical records to determine the onset of CIDP. (*Id.* at 20–23). Third, Mr. Nieves argues the Chief Special Master impaired his ability to respond to an opposing expert report regarding the onset of symptoms. (*Id.* at 23–24). Mr. Nieves requests that this Court reverse the Special Master's decision denying compensation. (*Id.* at 24). The Court addresses each argument in turn.

> *1.*  *The Chief Special Master properly determined there was insufficient evidence to establish that the flu vaccine did cause Mr. Nieves's CIDP.*

Mr. Nieves argues that the Chief Special Master misapplied *Althen* prong two to conclude that he failed to demonstrate a logical sequence of cause and effect between the flu vaccine and his CIDP. (Pet'r's Mem. at 16). First, Mr. Nieves argues the Chief Special Master erroneously found none of Mr. Nieves's treating physicians associated his peripheral neuropathy with the vaccine. (*Id.* at 16–17). Specifically, Mr. Nieves asserts that the Chief Special Master ignored the notes of a hospital neurologist who opined that the flu vaccine caused his peripheral neuropathy. (*Id.* (citing Ex. 9 at 28)). Mr. Nieves frames this as a smoking gun, evidence that the Chief

5

Special Master "fail[ed] to consider the record as a whole." (*See id.* (citing 42 U.S.C. § 300aa-13(a)(b))). This is unavailing.

As explained above, the Court reviews factual findings under the arbitrary and capricious standard. *Munn*, 970 F.2d at 870. Therefore, it must determine whether the special master considered relevant evidence, made plausible inferences, and articulated a rational basis for his decision. *Hines*, 940 F.2d at 1528. So long as the special master's conclusions are not "wholly implausible," the Court is compelled to uphold the findings as not arbitrary and capricious. *Hibbard v. Sec'y of Health & Hum. Servs.*, 698 F.3d 1355, 1363 (Fed. Cir. 2012) (quoting *Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1338 (Fed. Cir. 2010)). Further, the Court does not "reweigh" factual evidence, *Lampe*, 219 F.3d at 1360; rather, it determines if the special master committed a "reversible error." *E.g., Hibbard*, 698 F.3d at 1363.

Here, Mr. Nieves provided a voluminous medical record replete with physician notes and characterizations of his symptoms. (*See generally* Exs. 1–10). Despite the size of this record, Mr. Nieves highlights only one neurologist who explicitly linked his symptoms with the flu vaccine. (Pet'r's Mem. at 16–17). During his inpatient care, a neurologist noted that Mr. Nieves was experiencing "[p]rogressive weakness, ascending weakness in the legs with areflexia and severe back pain with paresthesias post flu shot due to possible [GBS]." (Pet'r's Mem. at 16–17 (quoting Ex. 9 at 28)). Despite the Chief Special Master's assertion that "no treater ever proposed any association between the October 201[5][9] vaccinations and [Mr. Nieves's] subsequent diagnosis[,]" *Nieves*, 2023 WL 3580148, at *56, this isolated note does not constitute reversible error. *See Hines*, 940 F.2d at 1528; *compare Contreras v. Sec'y of Health & Hum. Servs.*, 107 Fed. Cl. 280, 316–18 (2012) (finding reversible error when special master did not consider medical theories advanced by two experts). When compared to other evidence suggesting alternative causations, (*see, e.g.*, Ex. 3 at 44–47 ("prolonged duration of symptoms" likely indicated CIDP), 67–69 (symptoms were "unlikely neurological problem like GBS/cord compression."), this isolated reference to GBS is phrased as a speculative possibility. (*Id.*). Given conflicting evidence, the Court does not fault the Chief Special Master for attributing less weight to this "possib[ility]." (*Id.*).

Mr. Nieves also argues the Chief Special Master did not wholly consider the record because he overlooked this single physician-proposed association. (Pet'r's Mem. at 16 (citing *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1326 (Fed. Cir. 2006) (finding error when special master did not consider opinions of the treating physicians who opined the vaccine caused petitioner's injury)). However, the Chief Special Master discussed Mr. Nieves's medical records in detail to determine *Althen* prong two was not satisfied. *Nieves*, 2023 WL 3580148, at *2–6, 56–58. Notably, as discussed above, the record contains physician notes that attribute Mr. Nieves's symptoms to other causes. (*See generally* Exs. 3, 9). For example, at his November 3 neurologist appointment Mr. Nieves presented with "paresthesias in his distal extremities since he got his flu shot one week ago." (Ex. 3 at 84). The neurologist opined that Mr. Nieves's symptoms were "likely" due to nutritional deficiencies connected to Mr. Nieves's lap-band

---

[9] The Chief Special Master dated the vaccination to October 2014, *Nieves*, 2023 WL 3580148, at *56; the Court attributes this to a scrivener's error.

6

surgery earlier that year. (*Id.* at 86). Mr. Nieves's medical records contain conflicting opinions as to causation. (*Compare id.*, *with* Ex. 9 at 28).

Further, associations in the record between Mr. Nieves's symptoms and vaccination point to a self-reported temporal relationship, not necessarily causation. (*See generally* Exs. 3, 9); *see e.g., Yalacki v. Sec'y of Health & Hum. Servs.*, No. 14-278V, 2019 WL 1061429 (Fed. Cl. Spec. Mstr. Jan. 31, 2019), *aff'd* 146 Fed. Cl. 80 (2019) (finding self-reported association between symptoms and injury insufficient to establish causation). For example, the November 3 neurologist note contains temporal language not indicative of causation. (Ex. 3 at 84) (presenting with "paresthesias in his distal extremities *since* he got his flu shot one week ago" (emphasis added); *compare Since*, Merriam-Webster, https://www.merriam-webster.com/dictionary/since (last visited Aug. 3, 2023) (defined as "after a time in the past), *with Because*, Merriam-Webster, https://www.merriam-webster.com/dictionary/because (last visited Aug. 3, 2023) (defined as "by reason of"). Consequently, it was rational that the Chief Special Master determined such associations between Mr. Nieves's symptoms and the vaccine were likely self-reported and memorialized in the medical record. *Nieves*, 2023 WL 3580148, at *56–57. This conclusion is plausible, supported by the record, and rationally articulated. *See Hines*, 940 F.2d at 1528. Accordingly, the Chief Special Master considered relevant medical records to plausibly determine there was insufficient evidence from physicians that Mr. Nieves's CIDP was associated with his flu vaccination.

Second, Mr. Nieves argues the Chief Special Master impermissibly raised a petitioner's burden of proof by requiring direct evidence to corroborate that his CIDP was due to the flu vaccine. (Pet'r's Mem. at 18–19). This is a mixed question of law and fact. When faced with a mixed question, the Court must determine whether answering it primarily involves legal or factual work. *See U.S. Bank Nat. Ass'n*, 138 S. Ct. at 967. Here, Mr. Nieves cloaks a factual dispute under the guise of a legal challenge. *See e.g., Echols v. Sec'y of Health & Hum. Servs.*, 165 Fed. Cl. 9, 17 (2023).

As provided above, *Althen* requires a petitioner to preponderantly establish a "logical sequence of cause and effect showing that the vaccination was the reason for the injury[.]" *Althen*, 418 F.3d at 1278. Mr. Nieves argues that the Chief Special Master violated this standard when he stated that "nothing in the record corroborates" his theory of causation, and "[n]o exam determination, test, or other diagnostic findings provide reason to accept the argument that the vaccine was more likely than not the *explanation* for [Mr. Nieves's] neurologic complaints." (Pet'r's Mem. at 18 (quoting *Nieves*, 2023 WL 3580148, at *57 (emphasis in original))). Mr. Nieves asserts such an "objective confirmation" requirement violates *Althen*. (*Id.*). Although Mr. Nieves correctly articulates the standard, he mischaracterizes the Chief Special Master's application. (*See id.*).

Preponderant evidence requires that the vaccine be "a substantial factor in causing the illness, disability, injury or condition and that the harm would not have occurred in the absence of the vaccination." *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). In other words, a petitioner must show it is "more likely than not" that the onset of symptoms was linked to the vaccination. *Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010). The Chief Special Master properly determined Mr. Nieves failed to provide any evidence to corroborate his theory, let alone establish the flu

vaccine was a "substantial factor" in his CIDP. *Nieves*, 2023 WL 3580148, at *57; *Pafford*, 451 F.3d at 1355. Mr. Nieves's records only support a temporal relationship between his CIDP diagnosis and vaccination, not causation. *See Nieves*, 2023 WL 3580148, at *57. It is well-established that "a proximate temporal association alone does not suffice to show a causal link between the vaccination and the injury." *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). Petitioners must advance a medical theory causally connecting the two. *Id.* To this point, the Chief Special Master correctly noted that Mr. Nieves's experts differentiated his initial flu-like symptoms from his neurological symptoms, thereby undercutting the assertion that "the theory [was] working 'in real time.'" *Nieves*, 2023 WL 3580148, at *57. Accordingly, the Chief Special Master properly applied the preponderant evidence standard to his *Althen* prong two analysis.

Third, Mr. Nieves argues his comorbidities prior to the vaccination do not interfere with the logical sequence of cause of effect required under *Althen* prong two. (Pet'r's Mem. at 19–20). Specifically, Mr. Nieves argues that nothing in his medical records supports the Chief Special Master's conclusion that his pre-existing medical issues, including cervical issues resulting in surgery and fibromyalgia, "cannot be neatly separated" from his CIDP symptoms. (*Id.*); *Nieves*, 2023 WL 3580148, at *57. This is an issue of fact. However, Mr. Nieves ignores his pre-vaccination medical records that show he suffered from several health conditions with overlapping neurological symptoms. For example, he complained of arm and leg weakness, "episodes of legs going numb and him falling[,]" fibromyalgia, and muscle spasms. (Ex. 2 at 29–30, Ex. 4 at 12–17, Ex. 3 at 97–98). Such symptoms muddy the waters and support the conclusion that Mr. Nieves could have experienced a "meandering, progressive neuropathic course that did not fully manifest until after vaccination[,]" *Nieves*, 2023 WL 3580148, at *57, thereby undermining his argument that his medical medicals do not support the Chief Special Master's conclusion.

Further, Mr. Nieves argues that in violation of *Knudsen*, the Chief Special Master improperly concluded his pre-existing conditions were an alternate cause of CIDP. (Pet'r's Mem. at 20 (citing *Knudsen*, 35 F.3d at 549–50)). Mr. Nieves fails to properly apply *Knudsen* and again, mischaracterizes the Chief Special Master's analysis. In *Knudsen*, the Federal Circuit required the Secretary to "prove by a preponderance of the evidence" that an alternative infection caused the injury, not the vaccination. 35 F.3d at 543, 549. Mr. Nieves attempts to apply this same standard, arguing the lack of preponderant evidence that his pre-vaccination health issues caused his CIDP cannot be a potential alternate cause. (Pet'r's Mem. at 20). However, *Knudsen* was a Table case where the Secretary bore the burden of proof. *See generally* 35 F.3d 543. Mr. Nieves seeks review of a causation-in-fact claim where he bears the burden to preponderantly show the flu vaccine caused his CIDP. Similarly, the Chief Special Master did not conclude Mr. Nieves's pre-vaccination conditions were the alternative cause. *Nieves*, 2023 WL 3580148, at *57–58. Instead, he rejected Mr. Nieves's argument that "lack of an identified alternative cause" means the vaccine was "the only likely cause." *Id.* at *58. The Court declines to disrupt the Chief Special Master's conclusions. Accordingly, the Chief Special Master properly determined there was insufficient evidence to establish that the flu vaccine caused Mr. Nieves's CIDP.

> 2. *The Chief Special Master's factual findings were not arbitrary and capricious under Althen prong three.*

Mr. Nieves objects to the Chief Special Master's alleged reliance on the Nieves Affidavit over contemporaneous medical records to determine that the onset of CIDP symptoms occurred three and a half days after Mr. Nieves's vaccination. (Pet'r's Mem. at 20–23). He argues that his CIDP symptoms, namely weakness, paresthesias, difficulty walking, and impaired gate "were only mentioned on November 3, 2015" five days after the vaccination. (*Id*. at 21). Importantly, Mr. Nieves only challenges the Chief Special Master's conclusion that his symptoms occurred prior to the medically acceptable "five-to seven-plus day timeframe[,]" not the timeframe itself. (Pet'r's Mem. at 20–23). Mr. Nieves asserts that if the Chief Special Master "followed the medical records, [Mr. Nieves] would have satisfied the requirements under *Althen* prong [three]." [10] *Id.* at 23. This is a pure issue of fact. Under *Althen* prong three, a petitioner must show "the alleged vaccine injury occurred within a medically-acceptable time-frame[.]" *Contreras*, 107 Fed. Cl. at 302; *Grant*, 956 F.2d at 1148 ("[A] proximate temporal association alone does not suffice to show a causal link between the vaccination and the injury.").

Mr. Nieves again fails to engage the Court's standard of review. The Court does not "reweigh" factual evidence, question whether the special master correctly evaluated the evidence, or re-examine the probative value of the evidence. *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011). In vaccine cases, the Court of Federal Claims is not the factfinder. *Id.* So long as the Chief Special Master's factual determination is "based on evidence in the record that is not wholly implausible, [the Court is] compelled to uphold that finding as not being arbitrary or capricious." *Cedillo*, 617 F.3d at 1338 (cleaned up). Here, the Chief Special Master did not ignore Mr. Nieves's medical records in favor of the Nieves Affidavit.[11] *Nieves*, 2023 WL 3580148, at *51–56. In his *Althen* prong three analysis, the Chief Special Master engaged with physicians' notes immediately following the vaccination to make a determination: Mr. Nieves's "arguments make the mistake of conflating *onset* with *diagnosis*." *Id.* at *54 (emphasis in original). Specifically, the Chief Special Master noted that Mr. Nieves "repeatedly sought care" in the days after vaccination, *id.*; those physician notes are illuminating.

As explained above, Mr. Nieves reported experiencing neurological symptoms before November 3. During his November 3 neurologist appointment, he "present[ed] with [one] week history of paresthesia in his distal extremities[.]" (Pet. Ex. 3 at 84). Mr. Nieves equates the date he reported these symptoms with their actual onset. *See Nieves*, 2023 WL 3580148, at *54. At that same appointment, Mr. Nieves reported his walking was "off balance" and a police officer "thought he was intoxicated while walking." (*Id.* at 84–85). Even though the neurologist

---

[10] Mr. Nieves faults the Chief Special Master for relying on the Nieves Affidavit on some issues in lieu of contemporaneous medical records. (Pet'r's Mem. at 20–23). Ironically, in that affidavit, Mr. Nieves himself raised concerns about the accuracy of those medical records. (Nieves Aff. at 3).

[11] The Court echoes the Chief Special Master's cynicism that Mr. Nieves emphasized his affidavit when it supported his potential Table claim but tried to undermine it when it complicated his causation claim. *Nieves*, 2023 WL 3580148, at *56 n.48.

9

determined Mr. Nieves had a "normal gait" he was still reporting several days of neurological symptoms. Therefore, Mr. Nieves's medical records support the Chief Special Master's conclusion that his symptoms emerged before the medically acceptable five-day timeframe. Accordingly, the Court upholds the factual findings as not arbitrary or capricious.

### 3. The Chief Special Master exercised proper discretion over case management.

Mr. Nieves argues the Chief Special Master arbitrarily and capriciously[12] restricted his expert's analysis of the appropriate timeframe for the onset of symptoms. (Pet'r's Mem. at 20–21). Specifically, Mr. Nieves challenges the limitation that Dr. Omid Akbari's ("Dr. Akbari")[13] *third* report could only discuss medical literature regarding the onset of symptoms published in 2022. (*Id.* at 20). The Chief Special Master closed the record on August 1, 2022, limiting the expert's analysis to approximately seven months. (May 23, 2022 Order). Mr. Nieves argues he was denied the "meaningful opportunity to respond" to the potential three-and-a-half-day causation timeframe advanced by the Secretary's expert, Dr. S. Mark Tompkins ("Dr. Tompkins").[14] (Pet'r's Mem. at 20). Mr. Nieves asserts the only evidence supporting that timeframe was "a few lines in Dr. Tompkins's report" so the limitation prevented him from challenging its applicability. (*Id.*). However, the argument does not engage with the record, nor the discretion afforded to special masters.

Mr. Nieves fails to acknowledge that the three-and-a-half-day causation timeframe existed on the record *before* Dr. Tompkins's report. (*See id.* at 20–21). Mr. Nieves himself attested:

> [At a]pproximately 10 pm or 11 pm [on October 31], I began feeling strange. I noticed my walking was a little different. Around this time, I started losing some sensation in my hands and feet. I would approximate any sensations of paresthesia, tingling, or weakness would have started approximately [eighty-two to eighty-three] hours after the initial flu shot.

---

[12] Mr. Nieves frames his argument as arbitrary and capricious, but the appropriate standard is abuse of discretion. *See Masias v. Sec'y of Health & Hum. Servs.*, 634 F.3d 1283, 1287–88 (Fed. Cir. 2011) (internal citation omitted) (differentiating review of "fact findings by the special master under the arbitrary and capricious standard" with "discretionary rulings under the abuse of discretion standard"); *see also Nuance Commc'ns, Inc. v. ABBYY USA Software House, Inc.*, 813 F.3d 1368, 1372 (Fed. Cir. 2016) (reviewing case management decisions for abuse of discretion).

[13] The Chief Special Master recognized Dr. Akbari as an expert in immunology and allergy, though noting Dr. Akbari is not a medical doctor and does not diagnose or treat patients. *Nieves*, 2023 WL 3580148, at *18.

[14] The Chief Special Master admitted Dr. Tompkins as an expert in immunology. *Nieves*, 2023 WL 3580148, at *32.

(Nieves Aff. at 2). Mr. Nieves filed the affidavit on November 16, 2020, approximately one year and six months before the Chief Special Master's literature restriction, (s*ee generally id.*; May 23, 2022 Order); both parties enjoyed access to the affidavit. (*See* Nieves Aff. at 2; May 23, 2022 Order); *see also K.A. v. Sec'y of Health & Hum. Servs.*, 164 Fed. Cl. 98, 119 (2022) (rejecting "eleventh hour" request for a hearing after knowing about opposing party's position on relevant causation factor).

The special master's goal is to "mak[e] the proceedings expeditious, flexible, and less adversarial, while at the same time affording each party a full and fair opportunity to present its case." Vaccine Rule 3(b). Here, Mr. Nieves's experts had a full and fair opportunity to address the potential three-and-a-half-day causation timeframe before the literature restriction was implemented. Moreover, Mr. Nieves ignores the considerable discretion the Chief Special Master afforded him in presenting expert opinions and substantiation. *Nieves*, 2023 WL 3580148, at *17, n. 24, *28, n.36, *44, n.52 (noting one plaintiff expert offered seventy-eight individual articles to support his initial report and despite a cautionary instruction from the Chief Special Master, an additional twenty articles—some of questionable probativeness—to support his responsive report, for *168* total articles between plaintiff's experts). In sum, Mr. Nieves's protest regarding undue evidentiary restrictions is refuted by the record.

Further, Vaccine Rule 1(b) permits the special master to "decide the case promptly and efficiently." RCFC App. B.; *see also* Vaccine Rule 3(b). Such language affords the special master broad discretion over case management. *See Fetters on behalf of S.F. v. Sec'y of Health & Hum. Servs.*, 166 Fed. Cl. 189, 200 (2023) ("The Chief Special Master is entrusted with discretion to manage his own docket[.]"). The Chief Special Master ordered the literature restriction for Dr. Akbari's third report on May 23, 2022—in the case's fourth year—citing Mr. Nieves's five previous expert reports and pending motion to file three additional supplemental reports. (May 23, 2022 Order at 2). In that Order, the Chief Special Master allowed Mr. Nieves to file an additional expert report, subject to the restriction, to permit him "the 'last word' on substantive matters" despite efficiency concerns. (*Id.*). Mr. Nieves had ample opportunity to engage with the record, the restriction was only placed on the final two supplemental reports (by Drs. Akbari and Joseph Jeret[15]) filed almost two months after Dr. Tompkins's report. (ECF Nos. 83, 88-1, 88-2). Accordingly, the Chief Special Master did not abuse his discretion.

Based on the foregoing, the Court determines that the Chief Special Master considered the relevant evidence of record, drew plausible inferences, and articulated a rational basis for the decision. The Chief Special Master's April 17, 2023 ruling was not arbitrary, capricious, an abuse of discretion, or contrary to law.

### III.     Conclusion

---

[15] The Chief Special Master admitted Dr. Jeret as an expert in neurology with "expertise in [Electromyography/Nerve Conduction Study] ("EMG/NCS") studies and clinical familiarity with peripheral neuropathies like CIDP." *Nieves*, 2023 WL 3580148, at *12.

For the stated reasons, the Court hereby **DENIES** the Petitioner's Motion for Review, (ECF No. 106), and **AFFIRMS** the Chief Special Master's April 17, 2023 decision, (ECF No. 105). The Clerk is directed to enter judgment accordingly.

The Court has filed this ruling under seal. The parties shall confer to determine proposed redactions to which all the parties agree. Per Vaccine Rule 18(b), no later than **September 5, 2023**, the parties shall file a joint status report indicating their agreement with the proposed redactions, attaching a copy of those pages of the Court's ruling containing proposed redactions, with all proposed redactions clearly indicated.

**IT IS SO ORDERED.**



s/      David A. Tapp
DAVID A. TAPP, Judge